## BOPST v. DISTRICT OF COLUMBIA.
## DISTRICT OF COLUMBIA v. BOPST et al.
### Civ. A. No. 10329.

United States District Court
District of Columbia.
Dec. 23, 1948.

Nathan Patz, Baltimore, Maryland, for plaintiff and counterclaim defendant Bopst.

John J. Wilson, of the firm of Whiteford, Hart, Carmody & Wilson, Washington, D. C., for counterclaim defendant Maryland Casualty Co.

Lee F. Dante and Milton D. Korman, Asst. Corporation Counsel, D. C., Vernon E. West, Corporation Counsel and Chester H. Gray, Principal Assistant Corporation Counsel, Washington, D. C., for defendant and counterclaim plaintiff.

MORRIS, District Judge.

The complaint in this action was filed February 25, 1941, seeking recovery from the District of Columbia of three items: One in the amount of $3,510, claimed as damages for delays occasioned to the plaintiff while performing work as a contractor under a contract dated August 20, 1935, between the plaintiff as contractor and the District of Columbia, for which corporation the work was being performed, and for the performance of which contract the Maryland Casualty Company was surety upon the performance bond; one in the amount of $6,000, which amount was deducted as liquidated damages in the final payment made on October 1, 1937, by the District of Columbia with respect to said contract, on the ground that the plaintiff was not responsible for any delays; and one in the amount of $28,-450, also deducted from the final payment, representing the contract price for pumps which the District of Columbia rejected as not meeting the requirements of the con-

tract, on the ground that said deduction was improper, as the pumps were in all respects in conformity with the contract and the failure to meet required tests was due to improper testing instruments and construction work for which the plaintiff was not responsible. The District of Columbia filed answer on April 7, 1941, with copy of contract, specifications and other exhibits attached, in which it denied any delays on its part in the work of the plaintiff, asserted the right to make the deduction for liquidated damages, and denied any responsibility for the failure of the pumps to meet contract specifications, asserting that all conditions of testing and construction were in accordance with the contract and specifications. Subsequently, on May 6, 1941, the defendant filed an amended answer and counterclaim, the Maryland Casualty Company having been made a counterclaim defendant, in which the District of Columbia claimed the sum of $37,201, representing the difference between the contract price of the four pumps rejected and the sum of $65,651 which was the cost to the District of Columbia for pumps and work furnished by Worthington Pipe and Machinery Corporation, claimed to have been made necessary by the failure of the plaintiff to furnish the four pumps meeting contract and specifications requirements. Answer to said counterclaim was filed by the plaintiff, and a motion to dismiss said counterclaim was filed by the Maryland Casualty Company. This motion was denied, and answer to the counterclaim was filed by the Maryland Casualty Company. Motions for summary judgment on the counterclaim, first by the Maryland Casualty Company and later by the District of Columbia, were denied. Thereafter, upon order of the Court, records were inspected and depositions were taken. Upon failure of the plaintiff to comply with certain orders of the Court respecting the taking of his deposition, his complaint was dismissed with prejudice. Subsequent thereto the counterclaim defendants, upon the basis of certain records of the District of Columbia revealed by the inspection of records and depositions, moved for summary judgment in their favor and against the District of Columbia on the counterclaim. Hearings were had and memoranda submitted by the parties.

The contract involved related to work and equipment of the value of $128,695, in addition to the contract value of the rejected pumps, all in connection with the construction of a sewage disposal plant. It is quite apparent from the record that, after the installation of the four pumps around which the present controversy revolves, numerous tests were made, the results of which were below the efficiency and capacity requirements of the contract. The correspondence in the record reveals numerous attempts and extensions of time to bring about the desired result. An extension of time, prior to December 31, 1936, was granted in an order by the Commissioners of the District of Columbia for 234 calendar days, "cause of delay beyond control and without fault or negligence of the contractor." On April 30, 1937, the plaintiff was notified that four pumps were rejected, and the contractor directed to remove and reclaim said pumps at his own expense, and repay the District of Columbia in full any sums which may have been paid under the terms of said contract for the equipment so rejected, all under the provisions of section V of the specifications of the contract. On September 1, 1937, the District of Columbia, through its Assistant Engineer Commissioner, addressed a communication to the Maryland Casualty Company, advising that the District of Columbia proposed to make final payment on the work of the plaintiff under the contract here involved. This communication stated that the four main sewage pumps were formally rejected by the District under date of April 30, 1937, and no credit was being allowed the contractor on account of these items. The communication further stated that the final payment to the contractor would amount to the net of $13,945, after the deduction of $6,000 on account of liquidated damages resulting from 120 days' delay in the completion of the contract. The communication requested comment respecting the release of this final payment. Under date of September 17, 1937, a further communication to the Maryland Casualty Company requested comment

288

which had not been received, and, on September 18, 1937, the Maryland Casualty Company, replying to the two communications mentioned, requested that the payment be made—it being understood that the payment was to be accepted by the plaintiff under protest for reasons outlined in correspondence. On October 1, 1937, as previously stated, final payment was made by the District of Columbia to the plaintiff, accompanied by a statement showing the contract price of $127,700, to which was added items of change amounting to $995, a total of $128,695 (omitting the contract value of the four rejected pumps, $28,450), from which was deducted previous payments of $108,750 and liquidated damages of $6,000, leaving a balance of $13,945. This payment was accepted by the plaintiff under protest as to the omission of the value of the rejected pumps and the deduction of $6,000 liquidated damages.

It further appears from the record in this case that, subsequent to the rejection of the plaintiff's pumps and prior to the final payment, the District of Columbia solicited and received bids for the construction of pumps and the performance of certain miscellaneous construction which resulted in a contract between the District of Columbia and the Worthington Pump and Machinery Corporation dated September 10, 1937, in the contract amount of $65,651, which included not only the cost of furnishing the pumps, but the miscellaneous construction item in the contract amount of $10,675. It is not disputed that the pumps furnished by the Worthington Corporation were of somewhat different guaranteed efficiency and capacity than those specified in the plaintiff's contract, but it is contended that this was due to conditions effected by the installation of certain motor equipment by the plaintiff, and to which the Worthington contract had to be accommodated. Somewhat the same contention is made with respect to the necessity for the miscellaneous construction work.

So far as the record discloses, no claim of any kind was ever made upon the plaintiff, or his surety, nor was any notice given that claim would be made, for any replacement work under the Worthington contract at the time of the final payment to the plaintiff, the invitation for the bids, which resulted in the Worthington contract, the final settlement with the Worthington Pump and Machinery Corporation, or at any time prior to the institution of the instant suit, February 25, 1941, and not even in the original answer in this case, but only as a counterclaim filed with an amended answer thereafter. It is perfectly clear that, after repeated efforts to secure pumps which were needed for the operation of the proposed sewage disposal plant upon specifications and guaranteed efficiency which were found unworkable, the Commissioners of the District of Columbia considered it to be in the best interest of the District to reject the pumps, reclaim the monies paid therefor, and proceed to secure pumps of different efficiency and capacity requirements, even though the cost therefor was greater. Particularly is this evident in view of the controversial claims made by the plaintiff that the pumps furnished by him, under proper tests and conditions, met the requirements of the contract. The relevant part of section V of the specifications provided as follows: "In case of failure to show the efficiency, capacity and ability to handle sewage guaranteed by the Contractor, and as indicated by performance data submitted with his bid, the Contractor shall, at his own expense, modify, replace or rebuild the units until the guaranteed efficiency, capacity and ability to handle sewage are reached. If the Contractor is unable to bring the units up to the guaranteed efficiency, capacity, and ability to handle sewage, the units may be rejected and the Contractor shall then remove and reclaim the machinery at his own expense and repay the District in full any sums which may have been paid under the terms of this contract for the equipment so rejected." It is quite obvious that the Commissioners acted under the latter provision of this section, and treated the contract as terminated as of April 30, 1937, and the contract obligations of both parties discharged upon the final payment October 1, 1937, even though the

plaintiff Bopst insisted to the contrary by protesting the disallowance of the value of the rejected pumps and the deduction for liquidated damages.

When the plaintiff filed the instant suit, asserting the claims last mentioned, the District of Columbia not only in its original answer denied the right of the plaintiff to recover, but by its counterclaim filed in its amended answer raised for the first time its right to recover from the plaintiff the excess of the Worthington contract over plaintiff's contract under article 6 of the contract, which provides in so far as material here as follows:

"Article 6. Inspection.—(a) All material and workmanship (if not otherwise designated by the specifications) shall be subject to inspection, examination, and test by District inspectors at any and all times during manufacture and/or construction and at any and all places where such manufacture and/or construction are carried on. The District shall have the right to reject defective material and workmanship or require its correction. Rejected workmanship shall be satisfactorily corrected and rejected material shall be satisfactorily replaced with proper material without charge therefor, and the contractor shall promptly segregate and remove the same from the premises.

"If the contractor fails to proceed at once with the replacement of rejected material and/or the correction of defective workmanship, the District may, by contract or otherwise, replace such material and/or correct such workmanship and charge the cost thereof to the contractor, or may terminate the right of the contractor to proceed as provided in Article 9 of this contract."

■ That the District of Columbia asserted its counterclaim in these circumstances is understandable only if considered as a weapon of defense to prevent a recovery by the plaintiff. If the plaintiff was to be permitted successsfully to assert claims against the District upon matters which the District had considered settled, then, of course, the District should have the right to assert any claims which it might have under the contract notwithstanding the settlement. But this is no longer the situation. The plaintiff's claims have been dismissed, and he may no longer assert that the settlement made by the District of Columbia was not a final and complete one. There is, therefore, no justification for the District now to seek to disregard the finality of its settlement. That the District of Columbia did intend to avail itself of the provisions of section V of the specifications, and not to seek recovery for excess costs of the Worthington contract under article 6, which is not mandatory, is evident from its claim and deduction for liquidated damages, under article 9,[1] accruing from De-

<hr/>

1. "Article 9. Delays—Damages.—If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in article 1, or any extension thereof, or fails to complete said work within such time, the District, may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the District may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor and his sureties shall be liable to the District for any excess cost occasioned the District thereby. If the contractor's right to proceed is so terminated, the District may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. If the District does not terminate the right of the contractor to proceed, the contractor shall continue the work, in which event, the actual damages for the delay will be impossible to determine and in lieu thereof the contractor shall pay to the District, as fixed, agreed, and liquidated damages for each calendar day of delay until the work is completed or accepted, the amount as set forth in the specifications or accompanying papers, and the contractor and his sureties shall be liable for the amount thereof: Provided, That the right of the contractor to proceed shall not be terminated or the contractor charged with liquidated damages because of any delays in the completion of the

cember 31, 1936, to April 30, 1937, when the plaintiff's pumps were rejected. That this is so has become even more evident from the order of the Commissioners, sitting as a Board, on September 3, 1937:

"That work under Contract No. 12337 with the Industrial Piping and Engineering Company, for furnishing and installing sewage pumps and equipment, Unit #3 of the Sewage Treatment Plant, having been satisfactorily completed on April 30, 1937, is hereby accepted as of that date.

"The four main sewage pumps (Items 1a, 1b and 1c) having been rejected by a Commissioners' Order dated April 30, 1937, are not accepted and no credit will be allowed to the contractor for these rejected items." The payment by the Commissioners to the plaintiff of all monies due to the plaintiff, as reflected by the final settlement, leaves open to no question the determination of the District Commissioners not to charge the plaintiff with any excess cost arising out of their rejection of the plaintiff's pumps.

■ While the Commissioners of the District of Columbia might well have taken several alternate courses under the terms of the contract, the course which they did take to deal with a difficult situation is one clearly permitted by the terms of the contract. Even a municipal corporation may not accomplish a final settlement of a contract under one interpretation and then subsequently repudiate such settlement and secure further advantages by a different interpretation.

The motion of the counterclaim defendants for summary judgment will be granted.

work due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, or the District, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes: Provided Further, That the con-

tractor shall within 10 days from the beginning of any such delay, notify the Commissioners in writing of the causes of delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in their judgment the findings of fact justify such an extension, and their findings of fact thereon shall be final and conclusive on the parties hereto."